| COMMERCIAL BROKERS, INC. D/B/A RE/MAX COMMERCIAL BROKERS, INC. AND ROBERT E. TALBOT, INC. D/B/A TALBOT REALTY GROUP | * | NO. 2019-CA-0638 |
| | * | |
| | | COURT OF APPEAL |
| | * | |
| | | FOURTH CIRCUIT |
| | * | |
| VERSUS | | STATE OF LOUISIANA |
| | * | |
| JOHN J. HAZARD DRAYAGE & CONSTRUCTION CO., INC. AND TWIN SHORES LANDSCAPE AND CONSTRUCTION SERVICES, INC. | | |

* * * * * * *

APPEAL FROM
FIRST CITY COURT OF NEW ORLEANS
NO. 2016-07986, SECTION "B"
Honorable Angelique A. Reed, Judge
* * * * * *
**Judge Paula A. Brown**
* * * * * *

(Court composed of Judge Terri F. Love, Judge Daniel L. Dysart, Judge Paula A. Brown)


Gerald Wasserman
GERALD D. WASSERMAN, LLC
3939 North Causeway Boulevard
Suite 200
Metairie, LA 70002

    COUNSEL FOR PLAINTIFFS/APPELLEES


Christopher K. LeMieux
Johanna E. Lambert
1100 Poydras Street, Suite 1100
New Orleans, LA 70163

    COUNSEL FOR DEFENDANTS/APPELLANTS

            **EXCEPTION OF NO CAUSE OF
            ACTION AFFIRMED IN PART,
            REVERSED IN PART;
            JUDGMENT REVERSED
            APRIL 29, 2020**

PAB
TFL
DLD

This action arises out of a dispute over commercial real estate broker commission fees. Appellants, John J. Hazard Drayage & Construction Co., Inc. ("Hazard Construction") and Twin Shores Landscape and Construction Services, Inc. ("Twin Shores"), appeal the city court's judgment that overruled Appellants' exception of no cause of action. In addition, Appellants seek review of the city court's judgment that found Appellants liable to Appellees, Commercial Brokers, Inc. d/b/a RE/MAX Commercial Brokers, Inc. ("RE/MAX") and Robert E. Talbot, Inc. d/b/a/ Talbot Realty Group ("Talbot Realty") (collectively referred to as "RE/MAX & Talbot"), for unpaid broker commission fees ("commission fees"), along with interest, attorney fees and cost. For the reasons discussed, *infra*, we affirm in part and reverse in part the city court's judgment overruling Appellants' exception of no cause of action, and reverse the city court's judgment that found Appellants liable to Appellees for outstanding commission fees.

## FACTUAL AND PROCEDURAL HISTORY

Hazard Construction retained RE/MAX, a commercial realty company, to lease its property located at 701 South Alexander Street in New Orleans (the

1

"Alexander Street property"). Based on a recommendation from Talbot Realty, RE/MAX referred Joule, LLC ("Joule") as a tenant.

On March 3, 2011, Hazard Construction entered into a commercial lease with Joule for the Alexander Street property ("Lease I").[1] Lease I was for a term of 46 months, commencing on April 1, 2011 and ending at midnight on January 31, 2015. Lease I granted Joule the option to renew the lease for an additional three years under the same terms and conditions, except that the base rent would increase from $5,000.00 to $5,250.00 per month. In consideration for negotiating the terms of Lease I with tenant Joule, Lease I obligated Hazard Construction to pay to RE/MAX & Talbot an annual 6% commission, 3% each, during the term of Lease I and any lease renewals with Joule.

Before expiration of Lease I, Hazard Construction negotiated with Twin Shores to lease the Alexandria Street property. On December 29, 2014, Hazard Construction and Twin Shores drafted an agreement wherein Hazard Construction leased several properties to Twin Shores ("Lease II"), including the Alexander Street property. Lease II permitted Twin Shores to sublease all or any portion of the leased properties. Robert Hazard, Sr., the president of Hazard Construction, and Susanne Drygalla, the president of Twin Shores, signed Lease II on January 31, 2015. Lease II was to commence on February 1, 2015.

In a separate property lease agreement, also drafted on December 29, 2014, Twin Shores subleased to Joule the Alexander Street property (the "Sublease"). Ms. Drygalla and Julian Thomas, the managing partner of Joule, signed the Sublease on January 1, 2015. Similar to Lease II, the Sublease specified that

---

[1] RE/MAX drafted Lease I, RE/MAX represented Hazard Construction at the signing of Lease I, and Talbot Realty represented the interests of Joule.

Hazard Construction allowed Twin Shores to sublease any of the property included in Lease II. The Sublease between Twin Shores and Joule was to commence on February 1, 2015, for a term of three years at a monthly rate of $5,250.00. Additionally, the Sublease allowed Joule the use of approximately 50% of the Alexander Street property's yard parking space.

Hazard Construction paid to RE/MAX & Talbot the commission fees owed during the term of Lease I. Hazard Construction did not pay any subsequent commission fees to RE/MAX & Talbot after the Sublease went into effect on February 1, 2015.

On November 10, 2016, RE/MAX & Talbot filed suit (the "Petition') in First City Court for the Parish of Orleans against Hazard Construction and Twin Shores (collectively referred to as "Hazard & Twin").[2] RE/MAX & Talbot alleged that Hazard & Twin were liable for outstanding commission fees contractually owed under the terms negotiated in Lease I due to Joule's continued occupancy of the Alexander Street property after Lease I's expiration date. Hazard & Twin filed an exception of no cause of action and argued that RE/MAX & Talbot failed to assert a cause of action to recover outstanding commission fees on the grounds that Joule did not renew Lease I, and Twin Shores was not a party to Lease I. On November 14, 2017, the city court heard argument on Hazard & Twin's exception of no cause of action. The city court denied the exception on the same day.

The matter proceeded to trial on the merits on October 23, 2018. After submission of post-trial memoranda, on November 30, 2018, the city court

---

[2] RE/MAX also filed a first supplemental and amended petition on February 3, 2017, re-averring its initial allegations, attaching Lease II and the Sublease as exhibits, and updating the amount of the commission fees allegedly owed. For purposes of this opinion, the Petition and the supplemental petition are referenced as the "Petition."

rendered judgment against Hazard & Twin in favor of RE/MAX & Talbot in the amount of $15,120.00, along with interest on any unpaid commission fees until paid, attorney fees in the amount of 25%, interest, and court costs from the date of judicial demand.

This devolutive appeal followed.[3]

## DISCUSSION

Hazard & Twin contend that the city court erred in the following respects: (1) overruling the exception of no cause of action; (2) finding fraud in its reasons for judgment when RE/MAX & Talbot failed to alleged fraud in its Petition; (3) allocating damages based on the expired lease between Hazard Construction and Joule; and (4) finding that the President of John J. Hazard Drayage was the sole owner of Twin Shores. We will review each error in turn.

### *Exception of No Cause of Action*

The function of an exception of no cause of action is to determine whether the law affords a remedy based on the facts as alleged in the petition. *An Erny Girl L.L.C. v. BCNO 4 L.L.C.*, 2018-0360, p. 6 (La. App. 4 Cir. 9/26/18), 257 So.3d 212, 218. Appellate courts review a trial court's ruling on an exception of no cause of action using the *de novo* standard of review as the exception raises a question of law and the trial court's decision rests on the legal sufficiency of the plaintiff's petition. *Herman v. Tracage Development, L.L.C.*, 2016-0082, p. 4 (La. App. 4 Cir. 9/21/16), 201 So.3d 935, 939 (citations omitted). Generally, an exception is tried on the face of the petition, and evidence may not be introduced to support or

---

[3] The city court initially denied Hazard & Twin's motion for devolutive appeal. However, upon reconsideration, the city court found Hazard & Twin had not received the notice of signing of judgment, pursuant to La.C.C.P. arts. 1913 and 5002, and, in turn, granted the motion for devolutive appeal on March 19, 2019.

4

controvert whether the petition states a cause of action. *See* La. C.C.P. art. 931. In deciding whether to sustain an exception of no cause of action, the well-pleaded facts in the petition must be accepted as true. *Forrester v. Bruno*, 2018-0648, pp. 11-12 (La. App. 4 Cir. 5/1/19), --- So.3d ---, 2019 WL 1940341, *6 (citation omitted). The burden of proof to show the plaintiff has stated no cause of action rests on the mover. *Id*., 2018-0648, p. 12, --- So.3d at --- (citation omitted). The exception shall not be granted, "'unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle the plaintiff to relief.'" *Id*. (quoting *Mid-South Plumbing, LLC*, 2012-1731, p. 5, 126 So.3d at 736.

Hazard & Twin make two arguments in support of its exception of no cause of action. First, Hazard & Twin contend that because Joule did not renew Lease I, and the lease expired by its own terms on January 31, 2015, RE/MAX & Talbot failed to assert a cause of action to recover commission fees. Next, they argue RE/MAX & Talbot failed to state a cause of action against Twin Shores as Twin Shores was not a party to Lease I.

RE/MAX & Talbot alleged in the Petition the following pertinent allegations: (i) Hazard Construction agreed to pay 6% commission fees for any and all lease renewals by Joule; (ii) Robert W. Hazard, Sr., was the president of Hazard Construction and Robert W. Hazard, Jr., was the sole officer of Twin Shores on December 29, 2014; (iii) Lease II between Hazard Construction and Twin Shores and the Sublease between Joule and Twin Shores were each drafted on December 29, 2014—before Joule's Lease I expired; (iv) the Sublease contained the same lease terms as Lease I; (v) paragraph 31 of Lease I provided, in pertinent part, that "[l]essor agrees that if the property covered by this lease is sold or transferred during the term hereof or during the term of any renewal or extension hereof or

5

during the term of any new lease entered into, Lessor will pay any and all unpaid rental commissions to which RE/MAX is entitled. . . ;" and (vi) Hazard Construction had not paid commission fees owed based on Lease I's renewal.

RE/MAX & Talbot argue the dates of execution of Lease II and the Sublease—January 31, 2015 and January 1, 2015, respectively—show that Joule renewed Lease I, thereby entitling RE/MAX & Talbot to additional commission fees. Although Hazard & Twin dispute that Lease I was renewed, "'[e]very reasonable interpretation must be accorded the language of the petition in favor of maintaining its sufficiency and affording the plaintiff the opportunity of presenting evidence at trial.'" *Moses v. Moses*, 2015-0140, p. 4 (La. App. 4 Cir. 8/5/15), 174 So.3d 227, 230 (quoting *Badeaux v. Southeast Computer Bureau, Inc.*, 2005-0612, p. 7 (La. 3/17/06) 929 So.2d 1211, 1217)). Accordingly, we find the allegations pled in RE/MAX & Talbot's Petition, which this Court must accept as true, are sufficient to maintain a cause of action against Hazard Construction in its individual capacity.

We, however, find merit in Hazard & Twin's argument that the Petition fails to state a cause of action against Twin Shores. At its core, RE/MAX & Talbot's Petition seeks relief arising out of a breach of contract involving Lease I. The parties to Lease I were Hazard Construction and Joule. RE/MAX & Talbot alleged in the Petition that Hazard Construction and Joule entered the lease agreement as lessor and lessee on March 3, 2011 and that Lease I contained a provision requiring Hazard Construction to pay commission fees to RE/MAX & Talbot. Notably, the Petition does not name Twin Shores as a party to Lease I in any capacity. Pursuant to La. C.C. art. 1906, "[a] contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished." Thus, as Twin Shores was not

6

a party to Lease I, Twin Shores had no legal obligation to pay RE/MAX & Talbot commission fees. In addition, we find no facts alleged in RE/MAX & Talbot's Petition that would entitle it to relief against Twin Shores based upon a breach of contract. Hence, the city court erred, as a matter of law, in overruling Hazard & Twin's exception of no cause of action against Twin Shores.

*Fraud Allegations/ Judgment*

Hazard & Twin assert, in the second assigned error, that the city court erred in reaching its judgment based on a finding of fraud. Hazard & Twin argue RE/MAX & Talbot failed to plead fraud in its Petition. Hazard & Twin contend that, as a result, the city court applied an incorrect principle of law in finding that RE/MAX & Talbot was entitled to commission fees. We agree.

The city court, in its judgment in favor of RE/MAX & Talbot, wrote:

Hazard agreed to pay plaintiffs' commission of the property transferred during the terms of the lease, or have transferee expressly assume the payment thereof, in writing.

The court finds that the sublease agreement between Twin Shores and Joule, LLC was an attempt to defraud [RE/MAX] and circumvent their contractual commission obligation. Joule continues to occupy the premises, and never intended to leave.

"Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. . . ." La. C.C. art. 1953. As Hazard & Twin properly noted, La. C.C.P. art. 856[4] and established jurisprudential authority require that fraud be pled with particularity. *See Vagelos v. Abramson*, 2012-1235, p. 16 (La. App. 4 Cir. 10/2/13), 126 So.3d 639, 649. REMAX/Talbot counters, however, that

---

[4] La. C.C.P. art. 856 provides, in pertinent part, that '[i]n pleading fraud or mistake, the circumstances constituting fraud or mistake shall be alleged with particularity."

7

the word "fraud" need not be specifically mentioned in order to maintain a fraud action.

This Court recognizes that La. C.C.P. art. 856 does not require the word "fraud" be used in the petition in order to comply with the article's mandate to plead fraud with particularity. *See Helwick v. Montgomery Ventures*, 1995-0765, p. 6 (La. App. 4 Cir. 12/14/95), 665 So.2d 1303, 1306. Nonetheless, our jurisprudence does require the petition to assert with specificity allegations consistent with fraudulent behavior. *See Thrasher Const., Inc., v. Gibbs Residential, L.L.C.*, 2015-0607 (La. App. 4 Cir. 6/29/16), 197 So.3d 283. In *Thrasher*, a general contractor, Gibbs, filed a third party demand and reconventional demand for breach of contract against the subcontractor, Thrasher. The subcontractor, pursuant to La. R.S. 9:2772(A)(1)(a), filed an exception of peremption, maintaining that the general contractor's third party demand and reconventional demand were not timely because they were brought beyond the five-year period permitted for actions against a residential contractor after the certificate of substantial completion has been filed. In opposition, the general contractor maintained the five-year peremptive period did not apply, citing La. R.S. 9:2772(H), which provides an exception to the five-year peremptive period for damages caused by fraud. The general contractor alleged the subcontractor had transferred assets to other defendants in an attempt to avoid liability for defective work performed; and as such, was liable for damages caused by fraud. The district court granted the subcontractor's exception of peremption. On appeal, the general contractor argued the district court erred by disregarding its fraud allegations. The *Thrasher* court iterated that fraud must be pled with particularity and that a plaintiff's mere conclusion that he was defrauded by a defendant—

8

"'unaccompanied by formal allegations setting forth with particularity the circumstances alleged to constitute fraud'"—does not suffice. *Id.,* 2015-0607, pp. 15-16, 197 So.3d at 293 (quoting *Hardy v. Easy T.V. and Appliances of Louisiana, Inc.,* 01-0025, p. 4 (La. App. 4 Cir. 12/12/01), 804 So.2d 777, 781). *Thrasher* noted the general contractor's claim that the subcontractor transferred assets to avoid liability did not specify how the subcontractor's alleged fraud caused the breach of contract, the defective work, or the damages sued upon. Accordingly, the *Thrasher* Court found the general contractor's allegations did not constitute fraud. *Id*., 2015-0607, p. 16, 197 So.3d at 293.

Similarly, in the case *sub judice*, upon review of RE/MAX & Talbot's Petition, we find the Petition does not plead nor does it contain any factual allegations that constitute fraud. We therefore conclude that the city court based its judgment on an erroneous finding of fraud that was not pled with particularity.

This Court, in *Mercato Elisio, L.L.C. v. City of New Orleans*, 2018-0081, p. 4 (La. App. 4 Cir. 11/21/18), 259 So.3d 1235, 1239, quoting *Evans v. Lungrin*, 1997-0541, pp. 6-7 (La. 2/6/98), 708 So.2d 731, 735, explained the standard of review utilized when a trial court commits legal error in the fact-finding process as follows:

> It is well-settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." *Rosell v. ESCO*, 549 So.2d 840, 844 (La. 1989). However, where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent *de novo* review of the record and determine a preponderance of the evidence. *Ferrell v. Fireman's Fund Ins. Co.*, [19]94-1252 (La. 2/20/95), 650 So.2d 742, 747, *rev'd in part, on other grounds*, 96-3028 (La. 7/1/97), 696 So.2d 569, *reh'g denied*, [19]96-3028 (La. 9/19/97), 698 So.2d 1388. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. *See Lasha v. Olin Corp.*, 625 So.2d 1002, 1006

(La. 1993). Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. *See Lasha*, 625 So.2d at 1006. When such a prejudicial error of law skews the trial court's finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts *de novo*. *Lasha*, 625 So.2d at 1006.

Having found the city court committed an error of law in reaching its judgment based on unpled fraud allegations, a *de novo* review of the trial record is required to determine if RE/MAX &Talbot proved Lease I was renewed to warrant RE/MAX & Talbot an award for the unpaid commission fees.

### Lease renewal

Hazard & Twin contend that Lease I expired and was not renewed in accord with Lease I's notice provisions—which required Joule to submit written notice to Hazard Construction via certified or registered mail.[5] Hazard & Twin emphasize that Lease II and the Sublease are separate contracts from Lease I and the

---

[5] Lease I's notice requirements included the following:

24. Upon expiration or termination of this lease, Lessee shall surrender possession of the leased premises immediately to Lessor. Any holding over by Lessee shall not operate, except by written agreement, to extend or renew this lease . . . .

* * *

27. Any notice or other communication required or permitted to be given under this lease by Lessee to Lessor shall be in writing and shall be delivered in person or sent by United States Certified, or Registered Mail, postage prepaid, return receipt requested, and addressed to Lessor at the place where rent is required to be paid hereunder. Any notice or other communication required or permitted to be given under this lease by Lessor to Lessee shall be in writing and shall be delivered in person or sent by United States Certified or Registered Mail, postage prepaid, return receipt requested, addressed to Lessee at the leased premises. Each notice or communication shall be deemed to have been given as of the date so mailed or delivered, as the case may be. Either party may designate as a substitute address by which written notice to the other party and to RE/MAX Commercial Brokers, Inc. in the manner herein provided.

execution of those documents underscores that Lease I was not renewed in fact or through reconduction.[6]

Contrariwise, RE/MAX & Talbot contend Lease I was renewed when Joule signed the Sublease with Twin Shores—which contained the same renewal terms as Lease I—during the pendency of Joule's Lease I agreement with Hazard Construction. RE/MAX & Talbot argue Joule's signing of the Sublease shows it intended to renew Lease I and would have done so had Hazard & Twin not orchestrated the dates that Lease II and the Sublease were to go into effect—which RE/MAX & Talbot claim was done to circumvent payment of commission fees owed under Lease I. Alternatively, RE/MAX & Talbot assert that notwithstanding the lack of any written notice, Lease I was renewed through reconduction based on Hazard Construction's acquiescence to Joule's uninterrupted occupancy of the Alexander Street property after Lease I had expired.

After our *de novo* review, we conclude that Joule did not renew Lease I.

Lease I, between Hazard Construction and Joule, was for a period of forty-six months, commencing on April 1, 2011 and ending at midnight, January 31, 2015. Lease I gave Joule a right to renew the lease at the end of the lease term for an additional three years at an increased rate of $5,200.00, provided that notice of renewal was to be in writing; and Lease I provided that RE/MAX & Talbot receive an annual 6% commission fee during the term of the lease and any subsequent renewals.[7]

---

[6] La. C.C. art. 2721 states, in relevant part, that "[a] lease with a fixed term is reconducted if, after the expiration of the term, and without notice to vacate or terminate or other opposition by the lessor or the lessee, the lessee remains in possession."

[7] Lease I between Hazard Construction and Joule included the following:

**Leased Premises:**

Lease II, in which Hazard Construction leased the Alexander Street property

to Twin Shores, along with other properties, was drafted on December 29, 2014,

---

1(B) <u>701 S. Alexander Street, consisting of approximately 11,000 square foot office/warehouse space (rear dock level warehouse and office space)</u>.

**Term:**

3. This lease is for a term <u>46 months</u> commencing on <u>April 1, 2011</u> and ending at midnight <u>January 31, 2015</u>.

*\*\*\**

**Rental and Place of Payment:**

7. The rental under this Lease shall be <u>Two Thousand Five Hundred Dollars ($2500.00) per month for the nine (9) months commencing May 1, 2011. The rental shall then escalate to Five Thousand Dollars ($5,000.00) per month for the remaining thirty-six months of the initial term of the lease</u>. . . The Tenant shall have the option to renew for an additional three (3) years under the same terms and conditions in this lease except that the base rent will be increased to Five Thousand Two Hundred and Fifty Dollars ($5,250.00) per month, modified gross lease.

*\*\*\**

30. In consideration for its services put forth, in negotiating, this lease, furnishing representation and/or bringing Lessor and Lessee together, Lessor acknowledges that RE/MAX Commercial Brokers, Inc., who represents Lessor and Talbot Realty Group who represents Lessee have earned a commission for said services, which commission is earned upon the execution of this lease and is to be paid by Lessor in accordance with the subparagraph below. Lessor further agrees to pay the same percentage commission, payable in like manner, under any and all renewals, extensions, expansions or new leases made with the herein stated Lessee or any Sublessee , nominee or assignee thereof, provided that if this lease is canceled or terminated by mutual agreement of Lessor and Lessee without the written consent of RE/MAX Commercial Brokers, Inc. and the commission on rents payable during the unexpired term thereof has not been paid in full, Lessor shall immediately upon such cancellation or termination pay to RE/MAX Commercial Brokers, Inc. commission of 6% of such rents and RE/MAX Commercial Brokers will pay Talbot Realty Group 50% of the said commission.

    1. A cash commission of 6% of the scheduled annual gross rentals under this lease, to be paid annually in advance with the first payment of $1,350.00 due upon execution of this lease, $10,800.00 the remaining balance for the initial term, be in three installments of $3,600.00 each payable on January 1st of each year.

Owner agrees to pay Broker a commission as set forth in the paragraph above and further agrees to pay the same percentage commission, payable in like manner, under any and all renewals, extensions, expansions or new lease made with the Lessee hereunder or any nominee, sublessee or assignee thereof. . . .

signed on January 31, 2015, and scheduled to go into effect on February 1, 2015. In Lease II, Hazard Construction permitted the lessee, Twin Shores, to sublease any portion of the leased property.[8]

The Sublease between Joule and Twin Shores was signed on January 1, 2015, and it was to commence on February 1, 2015, for a term of three years at a monthly rate of $5,250.00. Additionally, the Sublease, unlike Lease I, allowed Joule the use of approximately 50% of the Alexander Street property's yard parking space.[9]

---

[8] Lease II contained, in pertinent part, the following:

**12/29/14**

**Property Lease Agreement**
**Parties:**

John J. Hazard (lessor) hereby leases to Twin Shores Landscape & Construction Services, Inc. (lessee) the entire property and warehouse/buildings located at 701 Alexander Street, 601 Murat, 707 S Murat & 4536 D'Hemecourt Streets property.

**Term:**

This lease shall be for 5 years commencing on 2/1/2015 & expiring on 2/1/2020. . . .

*** 

**Subleasing:**

Lessee shall be allowed to sublease all or any portion of the described property. . . .

[9] The Sublease between Twin Shores and Joule included the following:

**12/29/14**

**Property Lease Agreement**

Twin Shores (lessor) hereby subleases to Joule, LLC (lessee) the north elevated portion of the raised loading dock height warehouse and office space (approximately) 11,000 sf). The building is located at 701 S Alexander Street New Orleans, LA 70119. The lease also allows the use of approximately 50% of the yard parking space located at 701 S Alexander St.

**Term:**

First, we conclude that Lease I, Lease II, and the Sublease are three separate contracts. The parties to Lease I were Hazard Construction and Joule; the parties to Lease II were Hazard Construction and Twin Shores; and the parties to the Sublease were Twin Shores and Joule.

Second, Lease I required Joule to submit written notice to Hazard Construction of its intent to renew Lease I, and Joule did not give the required written notice. Consequently, Lease I expired.[10]

Third, we find that the execution of the Sublease between Joule and Twin Shores was not a renewal of Lease I. The Sublease offered an inducement, additional parking spaces, that was not included in Lease I; thus, the execution of the Sublease did not exclude the possibility that Joule may have elected not to renew Lease I. In addition, the record before us contains no direct evidence of Joule's intent to renew Lease I. A representative for Joule was not called as a witness to testify at trial. At trial, RE/MAX & Talbot called Peter Lombardo, a realtor with RE/MAX, and Robert Talbot, the owner of Talbot, as fact witnesses.[11] Mr. Lombardo testified that RE/MAX prepared Lease I and represented Hazard Construction's interests in the lease, whereas Talbot Realty represented Joule's interests. Mr. Lombardo reiterated that Lease I required Hazard Construction to

---

This lease shall be for 3 years commencing on 2/1/2015 & expiring on 2/1/2018. $5,250.00 is the monthly lease rate due before the 5th of each month. . . .

*\*\**

**Subleasing:**

John J. Hazard Dryage & Construction Co., Inc. (property owner) has allowed Twin Shores Landscape & Construction Services, Inc. to sublease any portion of the described property.

[10] In its judgment, the district court wrote, "Joule, LLC [,] did not exercise its right to renew the lease. . . ."

[11] Lease I, Lease II, and the Sublease were filed, introduced, and admitted into evidence at trial.

14

pay RE/MAX & Talbot commission fees as long as Joule remained a tenant at the Alexander Street property and throughout any Lease I renewals. Mr. Lombardo admitted on cross-examination that he was unaware of any written notice or communication by Joule to Hazard Construction to extend Lease I and that he never personally received or reviewed any written agreement that Joule renewed Lease I. Also, Mr. Talbot acknowledged on cross-examination that he never received a copy of any notice of renewal between Hazard Construction and Joule, although Joule did send Talbot Realty a copy of the Sublease.

Fourth, we find that Lease I was not renewed through reconduction. This Court discussed the legal doctrine of reconduction in *Succession of Sigur v. Henritzy*, 2013-0398, p. 12 (La. App. 4 Cir. 9/18/13), 126 So.3d 529, 537-38, as follows:

> Reconduction occurs "'when a fixed-term lease expires and the lessee without opposition continues to occupy the premises for more than a week.'" *Southern Ventures Corp. V. Texaco Inc.*, 372 So.2d 1228, 1230 (La. 1979) (quoting *Governor Claiborne Apartments, Inc. v. Attaldo*, 256 La. 218, 235 So.2d 574 (1970)). When reconduction occurs, "[t]he reconducted lease is actually a continuation of the lease under the same terms and conditions except that the fixed term or period of duration in the old lease is voided and the reconducted lease is considered to be by the month.'" *Id.*

As pointed out by Hazard & Twin, Lease I specifically prohibited reconduction. Section 24 of Lease I provided, in part, that upon Lease I's expiration that "[a]ny holding over by Lessee shall not operate, except by written agreement to extend or renew this lease." As discussed *supra*, Lease I expired; Joule's continued occupancy of the Alexander Street property was authorized only by the Sublease between Joule and Twin Shores.

"A contract is the law between the parties, and the parties will be held to full performance in good faith of the obligations of the contract." *Brenner v. Zaleski,*

15

2014-1323, p. 3 (La. App. 4 Cir.6/3/15), 174 So.3d 76, 79 (citations omitted). We acknowledge, as asserted by RE/MAX and Talbot, that the signing of the Sublease and Joule's continued occupancy of the Alexander Street property could arguably suggest Joule intended to renew Lease I. However, our jurisprudence is well established that "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." *French Quarter Realty v. Gambel*, 2005-0933, p. 7 (La. App. 4 Cir. 12/8/05), 921 So.2d 1025, 1029 (citing La. C.C. art. 2046). In this case, Lease I unambiguously required Joule to give written notice to Hazard Construction of any Lease renewal, which Joule did not do. Consequently, the Sublease—without testimony or other documentary evidence from Joule—cannot stand alone as proof that Joule intended to renew Lease I.

Finding Lease I was not renewed through written notice, the Sublease or reconduction, we conclude Hazard Construction did not breach its contract with RE/MAX & Talbot. Hence, the city court erred in awarding RE/MAX & Talbot commission fees based on Lease I's renewal.

***Allocation of Damages/Status of Robert Hazard, Sr.***

We pretermit discussion of Hazard & Twin's third and fourth assignments of error—the city court erred in awarding damages and in finding Robert W. Hazard, Sr., the president of Hazard Construction, was the sole owner of Twin Shores.[12] These assigned errors are moot in light of our finding that Hazard Construction did not breach its contract with RE/MAX & Talbot.

---

[12] Based on the evidence presented at trial, Robert J. Hazard, Jr., and Michelle Hazard were owners of Twin Shores Landscape and Construction Services, Inc.

16

## CONCLUSION

Based on the foregoing reasons, we affirm in part the city court's judgment denying Hazard Construction's exception of no cause of action and reverse in part the city court's judgment denying Twin Shores' exception of no cause of action. We, further, reverse the city court's judgment that found Hazard & Twin liable to RE/MAX & Talbot for outstanding commission fees.

**EXCEPTION OF NO CAUSE OF ACTION AFFIRMED IN PART; REVERSED IN PART; JUDGMENT REVERSED**